**SO ORDERED.**

**SIGNED this 30 day of March, 2018.**

_David M. Warren_
**David M. Warren**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO. 15-06713-5-DMW** |
| **ELAINE HOGAN ERWIN** | **CHAPTER 7** |
|     **Debtor** | |

| | |
|---|---|
| **JOSEPH M. LISCHWE, TRUSTEE** | |
|     **Plaintiff** | **ADVERSARY PROCEEDING** |
| **vs.** | **NO. 17-00055-5-DMW** |
| **CLEARONE ADVANTAGE, LLC and** | |
| **GLOBAL CLIENT SOLUTIONS, LLC** | |
|     **Defendants** | |

### ORDER DENYING MOTIONS TO COMPEL ARBITRATION

This matter comes on to be heard upon ClearOne Advantage, LLC's Motion to Compel Arbitration and Dismniss [sic] or Stay Proceedings filed by ClearOne Advantage, LLC ("ClearOne") on November 3, 2017 and Global Client Solutions, LLC's Motion to Compel Arbitration filed by Global Client Solutions, LLC ("GCS") on November 10, 2017 and the

respective responses filed by Joseph M. Lischwe, Trustee ("Plaintiff") on November 17, 2017 and November 22, 2017. The court conducted a hearing in Raleigh, North Carolina on November 29, 2017. Mark A. Finkelstein, Esq. appeared for ClearOne, Richard W. Epstein, Esq.[1] appeared for GCS, and Kathleen O'Malley, Esq. appeared for the Plaintiff. Based upon the pleadings and the arguments of counsel, the court makes the following findings of fact and conclusions of law:

1.      Elaine Hogan Erwin ("Debtor") filed a petition for relief under Chapter 7 of the United States Bankruptcy Code ("Bankruptcy Code") on December 14, 2015 ("Petition Date"). The court appointed the Plaintiff to fulfill the duties as provided in 11 U.S.C. § 704. The Debtor is a resident of North Carolina.

<u>The Debt Settlement Agreements</u>

2.      Prior to the Petition Date, on August 19, 2014, the Debtor entered into a Debt Resolution Agreement ("2014 ClearOne Agreement") with ClearOne pursuant to which the Debtor sought assistance settling unsecured debts in favor of Belk (a department store)[2] and Bank of America for less than the amount owed. The Debtor owed approximately $2,241.00 to Belk and approximately $52,358.00 to Bank of America.

3.      The 2014 ClearOne Agreement required the Debtor to deposit funds "into a special purpose bank account or such other bank account as you [the Debtor] may designate . . . for the exclusive purpose of accumulating funds for settlements and for the payment of our [ClearOne's]

---

[1] Mr. Epstein has not been admitted to practice in the Eastern District of North Carolina. Mr. Epstein filed a Notice of Appearance on October 30, 2017 indicating he would be working with Mark. C. Kurdys, Esq., an attorney who is admitted to practice in this district, as local counsel. Mr. Kurdys failed to attend the hearing on November 29, 2017, and both Mr. Epstein and Mr. Kurdys were in violation of Local Civil Rule 83.1 as a result. The court subsequently held a hearing at which Mr. Epstein and Mr. Kurdys explained the circumstances behind their failure to abide by Rule 83.1, and although Mr. Epstein and Mr. Kurdys unequivocally violated Local Civil Rule 83.1, the court elected not to impose sanctions.

[2] ClearOne's paperwork lists the creditor as "Belk/GEMB/SYNCB," presumably identifying both the department store and the banks that extend credit to customers who apply successfully for a Belk credit card.

fees." The Debtor executed a Dedicated Account Agreement ("2014 GCS Agreement") with GCS on August 19, 2014 in order to authorize GCS to access the "Dedicated Account" that would fund any settlements reached by ClearOne pursuant to the 2014 ClearOne Agreement. Under the terms of the 2014 GCS Agreement, GCS was responsible for "execut[ing] . . . payment instructions" given pursuant to any settlement reached between the Debtor and Belk or Bank of America.

      4.    ClearOne and GCS appear to have a very close business relationship. ClearOne handles the debt negotiation, and GCS handles the accounting and money transfers. It is unknown whether the two entities have any common ownership. The Dedicated Account Agreement and Applications that are part of the GCS Agreements include provisions allowing GCS to share with ClearOne information regarding the Debtor's Dedicated Account. That sort of sharing would allow ClearOne to ascertain when funds became available to withdraw a fee from the account.

      5.    The 2014 ClearOne Agreement estimated that ClearOne would be able to settle the total estimated debt of $54,599.00 for approximately $24,216.91. Based on the projected settlement amount and the Debtor's financial information provided to ClearOne, the 2014 ClearOne Agreement projected a forty-eight month payment period beginning in September, 2014, during which time the Debtor would make monthly payments in the amount of $798.00 into the Dedicated Account governed by the 2014 GCS Agreement. The 2014 ClearOne Agreement stated as follows:

> We [ClearOne] do not charge or collect any fee for our settlement services unless and until a debt settlement agreement is obtained and at least one payment is made towards settlement of that particular Debt. **When we negotiate a proposed settlement of a Debt and you make a payment toward settlement of that Debt, we charge and collect 25.00% of the enrollment amount of that Debt** . . . .

(emphasis in the 2014 ClearOne Agreement).

3

6.      The Plaintiff alleges the Debtor agreed to pay the Belk debt "in full" in March, 2015 after ClearOne failed to propose any acceptable settlement of the debt, and the Debtor received a demand letter relating to the debt.  The Debtor paid $2,050.00 to Belk through her Dedicated Account, and ClearOne deducted a fee in the amount of $560.25, twenty-five percent of the Debtor's estimate of the debt ($2,241.00).

7.      The Plaintiff alleges that with respect to the Bank of America debt, ClearOne communicated to the Debtor on April 1, 2015 a settlement offer whereby Bank of America would accept $47,000.00 in full settlement of the estimated $52,358.00 debt.  The proposed settlement allegedly required ten monthly installments of $4,700.00, but ClearOne also communicated with the Debtor that same day that the settlement would instead require two payments of $30,000.00 in May and June, 2015.  According to the transaction summary attached to the Amended Complaint, a payment of $4,700.00 was deducted from the Dedicated Account in April, 2015.  The Debtor allegedly ultimately rejected the $47,000.00 settlement offer but asserts she subsequently was informed by ClearOne that if she could make one $30,000.00 payment into her Dedicated Account, Bank of America would settle for that amount.  The Plaintiff alleges the Debtor deposited $30,000.00 into her Dedicated Account, and ClearOne used those funds to send one payment in the amount of $4,700.00 to Bank of America and withdrew its fee of $13,089.50 (twenty-five percent of the total estimated debt to Bank of America).  The Plaintiff alleges "ClearOne failed to continue to make settlement payments to Bank of America" after ClearOne withdrew its fee from the Dedicated Account, and that ClearOne and GCS "continue[d] to charge 'transaction fees' to the settlement account every month."  The Debtor ultimately withdrew remaining funds totaling approximately $12,170.00 from the Dedicated Account.  GCS allegedly collected fees totaling $156.25 in conjunction with its agreement with the Debtor.

4

8.      The Debtor entered into a second round of agreements with ClearOne and GCS on October 19, 2015 ("2015 ClearOne Agreement" and "2015 GCS Agreement," respectively) in another attempt to settle the Bank of America debt.  The Debtor again estimated the Bank of America debt to be $52,358.00, apparently not accounting for funds totaling $9,400.00 that were previously paid to Bank of America through the 2014 ClearOne Agreement.  The 2015 ClearOne Agreement projected a fee in the amount of $13,089.50, the same fee amount as ClearOne collected pursuant to the 2014 ClearOne Agreement in relation to the Bank of America debt.  The Debtor canceled the 2015 ClearOne Agreement and 2015 GCS Agreement in November, 2015.

9.      The Plaintiff filed a Complaint against ClearOne and GCS on August 4, 2017 and an Amended Complaint on November 22, 2017.  The Amended Complaint seeks recovery of funds paid to ClearOne and GCS during the two years preceding the Petition Date pursuant to 11 U.S.C. § 548 ("548 Claim") and alleges ClearOne and GCS engaged in conduct "in violation of Maryland and North Carolina laws governing unfair or deceptive trade practices" ("UDTP Claim").  The originally filed Complaint also included a claim for breach of contract against ClearOne and GCS, but the Amended Complaint does not include that cause of action, and any breach of contract claim is not relevant to the matter before the court.

10.     ClearOne asserts both causes of action contained in the Amended Complaint must be referred to arbitration.  GCS asserts only the UDTP Claim must be referred to arbitration.

11.     The Plaintiff argues he should not be compelled to arbitrate the claims contained in the Amended Complaint for various reasons.  First, the Plaintiff asserts the ClearOne Agreements, which were facilitated by the terms of the GCS Agreements, are for "debt adjusting," which is criminally illegal under North Carolina law, and the Agreements are void.  The Plaintiff also asserts his claims are outside the scope of the arbitration clauses contained in the various

5

Agreements, and that he never agreed to arbitration and should not be bound by those provisions within the Agreements. Importantly, the Plaintiff also asserted at the hearing that the arbitration agreements, in light of the choice of law provisions contained in the Agreements, operate as a prospective waiver of the Debtor's rights under North Carolina law and are unconscionable as a result. The court will address each of these arguments.

The Relevant Arbitration Provisions

12.     Section 7 of the 2014 ClearOne Agreement states that the 2014 ClearOne Agreement "shall be governed by and construed in accordance with the laws of the State of Maryland, excluding any conflicts of law provisions or principles." According to the Amended Complaint, ClearOne is a Maryland limited liability company with a principal place of business in Baltimore, Maryland.

13.     The 2014 ClearOne Agreement contains as "Exhibit C" an agreement entitled Dispute Resolution by Binding Arbitration which states in part as follows:

> In the event of any controversy, claim or dispute between you [the Debtor] and us [ClearOne] arising out of or relating to the Agreement or the breach, termination, enforcement, interpretation or validity of the Agreement, including any determination of the scope, enforcement or applicability of this Exhibit C, we [ClearOne] agree to arbitrate any dispute in the county in which you [the Debtor] reside or at such other location upon which we may agree.

Exhibit C is incorporated into the 2014 ClearOne Agreement by reference pursuant to a provision on the last page of the 2014 ClearOne Agreement.

14.     The 2014 GCS Agreement states as follows:

> In the event of any controversy, claim or dispute, whether statutory or otherwise, between the parties arising out of or relating to this Agreement, or to any of the services provided pursuant to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Tulsa County, Oklahoma, or in the county in which the customer resides, in accordance with the laws of Oklahoma.

6

According to the Amended Complaint, GCS is an Oklahoma limited liability company with a principal place of business in Tulsa, Oklahoma.

15.     The 2015 ClearOne Agreement states that "the laws of the State of Maryland, excluding any conflicts of law provisions or principles" shall apply to the Agreement.  The 2015 ClearOne Agreement contains as "Exhibit C" a Dispute Resolution by Binding Arbitration with identical language as the 2014 ClearOne Agreement Exhibit C governing arbitration of disputes. The 2015 ClearOne Agreement contains a provision incorporating Exhibit C as part of the agreement by reference.

16.     Section XVI of the 2015 GCS Agreement states that it "shall be governed by the laws of the state where you [the Debtor] reside, except that the state's rules or statutes governing arbitration procedures shall not apply.  Section XVIII states as follows:

> In the event of any controversy between the parties, including, but not limited, to any claim, dispute, suit, demand, cross claim, counterclaim, or third party complaint (whether statutory, in tort, or otherwise) arising out of or relating to this Agreement or its performance, breach, termination, enforcement, interpretation or validity, including the validity, scope or applicability of this provision to arbitrate, shall be determined by binding arbitration.

The Limitation of Damages Provision

17.     The 2014 GCS Agreement and the 2015 GCS Agreement provide the following provision relating to damages:

> Limitation of Liability:  Under no circumstances shall Global ever be liable for any special, incidental, consequential, exemplary or punitive damages.

DISCUSSION

Classification of the Causes of Action

18.    The 548 Claim (the First Claim for Relief in the Amended Complaint) is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).  This court has the authority to enter a final

judgment on that claim.

19.    The UDTP Claim (the Second Claim for Relief in the Amended Complaint) is quite

different.  That claim is a pre-petition state law claim that did not arise under Title 11 of the United

States Code and did not arise in the Debtor's bankruptcy case.  Adjudication of the UDTP Claim,

if the Plaintiff is successful, would have an effect on the Debtor's bankruptcy estate.  The UDTP

Claim is related to the Debtor's bankruptcy case, but it is non-core. *See Valley Historic Ltd. P'ship*

*v. Bank of N.Y.*, 486 F.3d 831, 836 (4th Cir. 2007) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984,

994 (3d Cir. 1984)).  The Debtor listed the UDTP Claim against ClearOne in her schedules filed

with the court, and the 548 Claim and the UDTP Claim are assets of the bankruptcy estate, and

any recovery from those actions, by prosecution by the Plaintiff, is for the benefit of the creditors

of the Debtor.  Absent clear consent from the parties, which the court does not have at this point

in the proceedings, the final judgment on the UDTP Claim must be entered by the United States

District Court based upon proposed findings of fact and conclusions of law. 28 U.S.C. § 157(c)(1).

Principles of Arbitration

20.    If parties agree to arbitration, which is the case under the Agreements, the general

rule is that arbitration should then follow.  The Federal Arbitration Act ("FAA") is very clear on

the subject.

> A written provision in . . . a contract evidencing a transaction involving commerce
> to settle by arbitration a controversy thereafter arising out of such contract . . . shall
> be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in*
> *equity for the revocation of any contract*.

8

9 U.S.C. § 2 (emphasis added).

21.     The United States Supreme Court has stated that the FAA places "arbitration agreements on an equal footing with other contracts . . . and requires courts to enforce them according to their terms." *Rent-a-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67, 130 S. Ct. 2772, 2776, 177 L. Ed. 2d 403, 410 (2010) (citing *Buckeye Check Cashing Inc. v. Cardegna*, 546. U.S. 440, 443, 126 S. Ct. 1204, 1207, 163 L. Ed. 2d 1038, 1042 (2006)).  They may be attacked on grounds normally used to challenge contracts including "fraud, duress or unconscionability." *Id.* at 68 (citation omitted).

22.     An arbitration agreement provides for an arbitrator to resolve disputes between parties relating to an underlying contractual agreement, but it also may provide for the arbitrator to determine "threshold issues concerning the arbitration agreement" itself. *See Rent-a-Center*, 561 U.S. at 68.  In *Rent-a-Center*, the Court adopted the nomenclature of the parties when it discussed the "delegation provision," whereby parties may "agree to arbitrate 'gateway' questions of 'arbitrability.'" *Id.* at 68-69.  These issues may include "whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy," *Id.* at 69, or the validity or enforceability of the arbitration agreement.  When threshold issues are delegated to an arbitrator, the arbitrator serves as "judge and jury" on preliminary issues and challenges raised by the parties regarding the arbitration agreement, so long as those determinations are encompassed by the delegation provision.

23.     If a party challenges an agreement to arbitrate, the court must closely examine any delegation provision to determine whether that provision delegates to the arbitrator the authority to adjudicate the challenge at issue.  Jackson, the challenger of the arbitration agreement in *Rent-a-Center*, did not challenge the delegation provision within his arbitration agreement, which gave

the arbitrator the exclusive authority, *inter alia*, to resolve any claim the arbitration agreement was "void or voidable" or unenforceable. 561 U.S. at 66. Jackson simply challenged the underlying agreement as being unconscionable, and for that reason, the court held that it must treat the contact as valid under Section 2 of the FAA and enforceable under Sections 3[3] and 4,[4] "leaving any challenge to the validity of the agreement . . . for the arbitrator." *Id*. at 72.

24.    In the present case the Plaintiff's challenges to the underlying Agreements with ClearOne and GCS alone do not prevent this matter from being referred to arbitration. That sole challenge would not be legally significant. The Plaintiff asserts the Agreements are illegal under North Carolina law, but the arbitration provisions clearly state that any challenge to the Agreements' validity must be arbitrated. The Plaintiff alleges his causes of action are outside the

---

[3] Section 3 of the FAA states as follows: "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.

[4] Section 4 of the FAA states as follows: "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof." 9 U.S.C. § 4.

scope of the arbitration agreements, but the arbitration agreements also state that a threshold determination of the scope of the arbitration agreement must be determined by an arbitrator.

25.     The challenge to the arbitration agreements specifically,[5] on the grounds that they operate as a prospective waiver of the Debtor's rights, requires the court to examine the delegation provisions within the arbitration agreements and to "consider the challenge before ordering compliance . . . ." *Rent-a-Center*, 561 U.S. at 64.

Examination of the Delegation Provisions

26.     The ClearOne Agreements both delegate to the arbitrator "any determination of the scope, enforcement or applicability" of the arbitration agreement. The 2014 GCS Agreement delegates to the arbitrator "the determination of the scope or applicability of" the arbitration agreement, and the 2015 GCS Agreement delegates to the arbitrator any determination of "the validity, scope or applicability of" the arbitration agreement.

27.     The delegation clauses contained in the ClearOne Agreements and the 2014 GCS Agreement do not preclude the court from examining the *validity* of the respective arbitration agreements. The court has the authority to consider the Plaintiff's challenge to those agreements.

---

[5] At the hearing, the Plaintiff challenged both the arbitration agreements generally and the delegation clauses within those agreements specifically. As explained, *infra*, the Plaintiff is not precluded by the delegation clauses from challenging the arbitration agreements, and Plaintiff was not limited to challenging the delegation provisions specifically, due to their language and scope.

<u>Prospective Waiver of the Debtor's Statutory Rights</u>

28.    Sections 14-423[6] and 424[7] of the North Carolina General Statutes make it a Class 2 misdemeanor to enter into debt adjusting with a resident of North Carolina. N.C. Gen. Stat. § 14-423 (2007); N.C. Gen. Stat. § 14-424 (1994).   Section 14-425 provides the superior court "jurisdiction, in an action brought in the name of the State by the Attorney General or the district attorney of the prosecutorial district . . . to enjoin, as an unfair or deceptive trade practice, the continuation of any debt adjusting business or the offering of any debt adjusting services." N.C. Gen. Stat. § 14-425 (2007).

29.    Both of the ClearOne Agreements provide that the laws of the state of Maryland shall apply to those Agreements.   Under the 2014 GCS Agreement, the Agreement (including its

---

[6] N.C. Gen. Stat. § 14-423 states as follows:
"Definitions.
As used in this Article, the following definitions apply:
(1) "Debt adjuster" means a person who engages in, attempts to engage in, or offers to engage in the practice or business of debt adjusting.
(2) "Debt adjusting" means entering into or making a contract, express or implied, with a particular debtor whereby the debtor agrees to pay a certain amount of money periodically to the person engaged in the debt adjusting business and that person, for consideration, agrees to distribute, or distributes the same among certain specified creditors in accordance with a plan agreed upon. Debt adjusting includes the business or practice of any person who holds himself out as acting or offering or attempting to act for consideration as an intermediary between a debtor and his creditors for the purpose of settling, compounding, or in any way altering the terms of payment of any debt of a debtor, and to that end receives money or other property from the debtor, or on behalf of the debtor, for the payment to, or distribution among, the creditors of the debtor. Debt adjusting also includes the business or practice of debt settlement or foreclosure assistance whereby any person holds himself or herself out as acting for consideration as an intermediary between a debtor and the debtor's creditors for the purpose of reducing, settling, or altering the terms of the payment of any debt of the debtor, whether or not the person distributes the debtor's funds or property among the creditors, and receives a fee or other consideration for reducing, settling, or altering the terms of the payment of the debt in advance of the debt settlement having been completed or in advance of all the services agreed to having been rendered in full.
(3) "Debtor" means an individual who resides in North Carolina, and includes two or more individuals who are jointly and severally, or jointly or severally, indebted to a creditor or creditors.
(3a) "Nominal consideration" means a fee or a contribution to cover the cost of administering a debt management plan not to exceed forty dollars ($40.00) for origination or setup of the debt management plan and ten percent (10%) of the monthly payment disbursed under the debt management plan, not to exceed forty dollars ($40.00) per month.
(4) "Person" means an individual, firm, partnership, limited partnership, corporation, or association." N.C. Gen. Stat. § 14-423 (2007).

[7] N.C. Gen. Stat. § 14-424 states as follows:
"Engaging, etc., in business of debt adjusting a misdemeanor.
If any person shall engage in, or offer to or attempt to, engage in the business or practice of debt adjusting, or if any person shall hereafter act, offer to act, or attempt to act as a debt adjuster, he shall be guilty of a Class 2 misdemeanor." N.C. Gen. Stat. § 14-424 (1994).

arbitration provision) is to be construed in accordance with the laws of the state of Oklahoma.
Maryland law, generally, allows registered debt adjusters to collect a fee after a "consumer has
made at least one payment in accordance with the debt settlement services agreement." MD. CODE
ANN., FIN. INST. § 12-1010(c)(3) (LexisNexis 2011).  The parties have not provided the court with
information regarding Oklahoma law, but based on the court's limited inquiry, Oklahoma does not
appear to regulate debt adjusting or debt settlement.  If the Debtor (and now the Plaintiff) were
bound by the laws of Maryland and Oklahoma in challenging the Defendants' conduct, the Debtor
would risk losing the ability to challenge the validity of the Agreements based on their alleged[8]
illegal nature under North Carolina law and to assert the illegality of the Agreements in support of
a claim the Defendants engaged in unfair or deceptive trade practices.

30.    "[A]rbitration agreements that operate 'as a prospective waiver of a party's right to
pursue statutory remedies' are not enforceable because they are in violation of public policy."
*Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 333 (4th Cir. 2017) (quoting *Mitsubishi Motors
Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19, 105 S. Ct. 3346, 87 L. Ed. 2d 444
(1985)).  Although the presence of a choice of law provision in an agreement does not, "of itself,
. . . trigger application of the prospective waiver doctrine," *Dillon*, 856 at 333, in this case the laws
of Maryland and the absence of regulation under Oklahoma law directly conflict with the
provisions of N.C. Gen. Stat. § 14-423 *et. seq*.  Without the ability to assert the illegality of the
Defendants' conduct in support of the UDTP Claim, the Plaintiff would be severely restricted in
pursuing that claim.  The choice of law provisions in the ClearOne Agreements and the 2014 GCS
Agreement prospectively limit the Debtor's (and now the Plaintiff's) rights and render the

---

[8] ClearOne asserts that its actions do not qualify as debt adjusting because it meets certain standards identified
in N.C. Gen. Stat. § 14-426.  GCS asserts that its business of facilitating financial transactions through dedicated
accounts has nothing to do with the provisions of N.C. Gen. Stat. § 14-423 *et. seq*.  The court is not making any finding
whether ClearOne or GCS has engaged in or facilitated debt adjusting as prohibited under North Carolina law.

arbitration agreements unconscionable and invalid. The arbitration terms of the Agreements are invalid as a matter law and are ineffective to establish a right to arbitration.

31.     The court notes that the 2014 GCS Agreement becomes even more onerous through its Limitation of Liability provision, one that affects a statutory right of the Debtor. That provision allows for no recovery against GCS for any "special, incidental, consequential, exemplary or punitive" liability, no matter how egregious its conduct and no matter its collusion with ClearOne. This provision alone is sufficient to establish a preclusion of the statutory rights of the Debtor.

32.     The 2015 GCS Agreement is governed by the laws of the state of the Debtor's residence which is North Carolina. Although the choice of law provision changed from Oklahoma to North Carolina, it appears that the majority of the actions alleged in the UDTP Claim occurred prior to October 19, 2015, the date of the 2015 GCS Agreement, meaning that Oklahoma law would apply to the Plaintiff's claims against GCS if the matter were referred to arbitration. The 2015 GCS Agreement is not relevant to the court's determination that the UDTP Claim should not be arbitrated.

<u>Conflicting Policies of the Bankruptcy Code and Arbitration</u>

33.     Even if the arbitration agreements were valid, the constitutionally core 548 Claim should not be sent to arbitration, and the UDTP Claim should not be severed from the 548 Claim in the interests of judicial efficiency and of maximizing in an expedient manner the Debtor's estate for repayment of creditors (or, in the alternative, determining expeditiously that the Debtor's estate will not be augmented by way of the Plaintiff's claims).

34.     "[I]n cases where tension arises between the FAA and another statute, . . . the party seeking to prevent enforcement of an applicable arbitration agreement must show that 'Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'"

*Moses v. CashCall, Inc*., 781. F.3d 63, 71 (4th Cir. 2015) (quoting *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 90, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)).  Congressional intent under these circumstances "must be deducible from (1) the statute's text; (2) its legislative history; or (3) 'an inherent conflict between arbitration and the statute's underlying purposes.'" *Id.* (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987)).  Section 548 of the Bankruptcy Code serves an essential purpose that is central to the administration of assets to creditors under the priorities of the Bankruptcy Code.  It allows a trustee to recover certain transfers made by a debtor in the two years preceding the bankruptcy so that the recovered funds can be distributed among the debtor's creditors.  Sending the 548 Claim to be arbitrated would pose a conflict with the Bankruptcy Code, and for that reason, the 548 Claim should remain before this court.

35.    In addition, the Plaintiff argues that the 548 Claim should not be subject to arbitration because in bringing that claim, the Plaintiff is "stepping into the shoes" of the Debtor's creditors, not the Debtor.  As a result, the Plaintiff asserts he is not bound by the provisions of the arbitration agreements.  The court finds this argument persuasive, but due to the clear conflict between the purposes of 11 U.S.C. § 548 and the prospect of arbitration, a detailed analysis of the merits of this argument is unnecessary.  Instead, the court will focus on the disastrous result for the bankruptcy estate if the UDTP Claim were sent to arbitration while the court retained the 548 Claim.

36.    In *Moses v. CashCall, Inc*., 781. F.3d 63 (4th Cir. 2015), the Fourth Circuit Court of Appeals recognized the policy conflict between the Bankruptcy Code and arbitration.  In that case, originating in the United States Bankruptcy Court for the Eastern District of North Carolina, the Chapter 13 debtor filed an adversary proceeding with two causes of action.  The first sought a

declaratory judgment that the debtor's loan from Western Sky Financial, LLC ("Western"), the assignor of the appellant CashCall, Inc. ("CashCall"), was void under North Carolina law. The second was for damages under the North Carolina Debt Collection Act.

37.     The debtor entered into a loan agreement with Western for a $1,500.00 loan. The loan agreement provided that the loan would be subject to the laws and jurisdiction of the Cheyenne River Sioux Tribe, and that any dispute would be resolved by arbitration conducted by the Cheyenne River Sioux Tribal Nation. CashCall, as assignee, filed a motion to dismiss or, in the alternative, to stay the matter and compel arbitration. The bankruptcy court denied both motions, retaining the matter for adjudication. CashCall appealed to the district court which affirmed the bankruptcy court. CashCall appealed to the Fourth Circuit Court of Appeals which affirmed the district court on the first cause of action with respect to the validity of the loan, allowing the bankruptcy court to retain the ultimate determination of the amount of CashCall's proof of claim but reversed on the second claim. The circuit court stated that "forcing [the debtor] to arbitrate her constitutionally core claim would inherently conflict with the purposes of the Bankruptcy Code . . . ." *Moses*, 781 F.3d at 73.

38.     A divided court held that the second claim, dealing with the North Carolina Debt Collection Act, should have been sent to arbitration. Dissenting, Judge Niemeyer stated that splitting closely related claims and sending the second claim to a "questionable and perhaps illusory arbitration proceeding would inherently conflict with the purposes of the Bankruptcy Code . . . ." *Id*. Further, Judge Niemeyer reasoned that when a single adversary proceeding has both core and non-core causes of action, the strength of the relationship between the core and non-core claim should influence the decision to retain both claims. *Id*. at 74. In the present case the arbitration proceeding has more credibility than that in *Moses*, but the relationship between the

core and non-core matters is remarkably close, and "splitting the claim" is not appropriate.  For

example, the arbitrator could determine that the Debtor received fair and equivalent value for the

services allegedly rendered by ClearOne and GCS.  Further, the arbitrator could determine that the

Debtor was not insolvent or became insolvent as a result of the transfers to ClearOne and GCS.

Those findings could, and probably would, conflict with findings by the court, and even worse,

the court, which makes these determinations regularly, could be estopped from making different

findings under the same set of facts.  While these instances involve finding facts, they are then

used in applying the law.  This conflict is preventable by not bifurcating the 548 Claim and the

UDTP Claim.  ClearOne has already conceded that "the fraudulent transfer claim depends on the

same questions of law and fact as the state law claims." Memorandum of ClearOne Advantage,

LLC, *Lischwe v. ClearOne Advantage, LLC and Global Client Solutions, LLC*, (*In re Erwin*), Adv.

Pro. No. 17-00055-5-DMW (Bankr. E.D.N.C. Nov. 3, 2017) (DE 23).  Justice Black, joined in his

dissent by Justices Douglas and Stewart, stated "the arbitrators who the Court holds are to

adjudicate the legal validity of the contract need not even be lawyers, and in all probability will be

nonlawyers, wholly unqualified to decide legal issues, and even if qualified to apply the law, not

bound to do so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395, 407, 87 S. Ct.

1801, 1808, 18 L. Ed. 2d 1270, 1279 (1967).  Arbitration has its place, but not when its

involvement would directly interfere with the administration of the bankruptcy estate.

     39.    Judge Niemeyer in *Moses* noted that "having two tribunals adjudicate the identical

issue is not efficient." 781 F.3d at 75. "[W]hile efficiency is not considered in determining whether

to withhold arbitration in other contexts, it is relevant where, as here, the Bankruptcy Code is

involved." *Id*. at 76. (citation omitted).  In the present case the issues are not identical but they are

so closely related that two tribunals working independently and possibly in conflict would be a drastic waste of resources.

40.    Judge Niemeyer also recognized that separating the claims, as suggested by GCS in the present case, could cause an inherent conflict with the purposes of the Bankruptcy Code. "[A]n arbitration proceeding could come to a judgment before the bankruptcy court ruling and inappropriately bind the bankruptcy court on the validity of CashCall's Loan Agreement, a constitutionally core issue for the bankruptcy court to decide." *Id*. at 76.  As mentioned above, if the non-core UDTP Claim were sent to arbitration, those findings could have a significant impact upon the core 548 Claim.  More significantly, as argued by ClearOne, the arbitrator should have authority to determine the constitutionally core matter reserved specifically for the bankruptcy court.  A greater challenge to judicial integrity could hardly be imagined.

41.    Dissenting from the court's finding that the first claim should remain before the bankruptcy court, Judge Davis held that CashCall had abandoned its proof of claim, robbing the bankruptcy court of any constitutionally core claims because the first cause of action was core as a claim that would necessarily be resolved in the claims allowance process.  When that core claim "evaporates," no core claim exists for referral to arbitration.  The only claim left for arbitration consideration is the non-core claim. *Id*. at 91.  In the present case the 548 Claim is not subject to "evaporation" or dismissal, so the present case is distinguishable.

42.    Judge Gregory noted in his concurring opinion in *Moses* that for the first time in her case now before the circuit court, the appellee, Moses, challenged the choice of law and arbitration provisions in the CashCall loan agreement.  Even though the bankruptcy and district courts had refused arbitration, Moses did not raise that particular issue before those courts, precluding the circuit court from considering revocation of the arbitration agreement as

18

unconscionable. *Id.* at 87.   The arbitration challenge by the Plaintiff in the present case distinguishes it from *Moses*.

<u>The Orderly, Efficient and Effective Administration of the Estate</u>

43.     In a case almost identical to the present case, the United States District Court for the District of Colorado affirmed the bankruptcy court's decision to deny a request by the defendants to compel arbitration.  In *Larson v. Swift Rock Financial, Inc., d/b/a World Law Group, d/b/a World Law Debt; Orion Processing, LLC, d/b/a World Law Processing; and Global Client Solutions, LLC*[9] (*In re Craig*), 545 B.R. 47 (D. Colo. 2015), the district court reviewed a bankruptcy case in which the Chapter 7 trustee filed an adversary proceeding to recover transfers to the defendants under 11 U.S.C. § 548(a) and under the Colorado Uniform Debt Management Services Act ("CUDMSA") because the excessive fees violated the provisions of the CUDMSA, which is very similar to the North Carolina Unfair and Deceptive Trade Practices Act.  The GCS Dedicated Account Agreement in *Craig* is identical to the 2014 GCS Agreement, except for minor font variations.  Mr. Epstein, who represented GCS in *Craig*,[10] made very similar arguments, to no avail, to those he made in this matter.  United States Bankruptcy Judge Sidney B. Brooks made the following oral ruling that was transcribed at Docket Entry 43 in the *Craig* bankruptcy case:

> The Court believes that the motion filed by Global has three fundamental flaws or to put it another way, consequential deficiencies. First is that the Trustee is alleged by Global in its motion to have made simple basic contract claims and is thus, A, subject to arbitration, and B, beyond the authority or jurisdiction of the Bankruptcy Court. That's simply wrong. This is not fundamentally a contract matter. It is fundamentally a fraudulent transfer claim under 11 USC 548, which is a, if you will, seminal and central feature of the Bankruptcy Code as the Debtor attempts to assemble an estate, define what is and is not property of the estate and

_____

[9] The entire caption is used to establish that GCS, one of the defendants in the present case, was a party to the Colorado case.  Only GCS appealed the March 19, 2015 ruling of the bankruptcy court.

[10] While Mr. Epstein was under no ethical duty to disclose this prior adverse ruling because it was not rendered in the controlling jurisdiction, the court is disappointed in the lack of candor, given his prior professional conduct in failing to comply with this court's local rules.

assert a fraudulent transfer claim. Frankly, I think the Trustee's response to paragraphs 1(a), pages 5 and 6, state it well and articulate correctly what the centerpiece, what the gravamen is of this complaint. It is founded on 548(a) and that is the dominant and essentially controlling feature of the litigation, at least as far as claims are being made.

The second fundamental flaw I think is Global's assertion that the Court has no discretion in the determination of whether or not to have a dispute or this dispute subjected to arbitration rather than judicial determination. Global argues that it must go to arbitration. That, too, is simply wrong and I would point to three cases which allow the conclusion that Global's argument there is just not well founded and that's *In Re Payton Construction Corporation*, 399 B.R. 352, *Hollands vs. Debt Relief of America*, 479 F.Supp 2d, 1099 and third, the matter of *National Gypsum Company*, 118 F.3d 1056. That point simply doesn't need further emphasis.

The third fatal flaw, fundamental flaw, is the assertion by Global that Global Client Solutions, LLC is a separate, independent and non-collaborating or non-coordinating entity with the remaining two defendants, Swift Rock Financial dba World Law Group and Orion Processing, LLC dba World Law Processing.

I think, again, the Trustee at page 1 through portions of page 2 specifies and makes certain allegations in its response and sets out alleged facts as to the bundled nature and interrelationships between and among the three Defendants and this business operation. Those factual allegations set forth in the Trustee's response heretofore not refuted, certainly allow for a reasonable inference that Global was structurally and operationally connected to the other two Defendants, it cooperated and to one degree or another coordinated its business with the other two Defendants and it may well have been complicit in the possible alleged activity alleged to be a scam that may have ensnared this Debtor, Ms. Craig.

Certainly at this stage, the Court believes that those allegations as I indicated, the connections, the factual alleged connections not yet refuted, show a coordinated, perhaps even complicit operation among these three Defendants and their business.

I would point out that the Trustee really makes no breach of contract allegations. His principal and dominant allegations are under 548(a)(1). They are a direct claim by the Trustee and not a derivative claim of the Debtor and Section 548 simply gives the Trustee direct and substantial avoiding powers for the benefit of the estate and the Trustee's exercising core substantive rights in the Bankruptcy Code, and as I indicated earlier, I believe that the *National Gypsum* case and the other cases basically to a greater or lesser degree support that proposition. *National Gypsum* does have a conclusion that non-enforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, i.e., whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and

if so, whether arbitration of the proceeding would conflict with the purposes of the Code.

Here, Section 548 derives exclusively from the Code and indeed, the claim, the arbitration demand and arbitration of this dispute would conflict with the purposes of the Code. Among others, those purposes of the Code include timely, efficient, unified administration of a bankruptcy case and to the degree allowed by constitutional constraints and Sterm (phonetic)[11] considerations, effective dispute resolution as part of the package of Bankruptcy Code provisions and its legal framework.

Additional conclusions that I would put on the record with respect to the Colorado Uniform Debt Management Services Act, that's the second claim of the Trustee, Global contends the Trustee's claim here that the Defendants were providing debt management services without authorization under the state law is a non-core state law claim and therefore should be arbitrated. Trustee responds that Global's motion to compel arbitration is unenforceable under the Federal Arbitration Act and the Uniform State Act has public policy provisions which seek to prevent citizens from use of predatory services.

Moreover, this arbitration clause is arguably a printed contract of adhesion and I would refer to the *Hollands* case. I believe that is the one that stands for that proposition. *Hollands* and *Payton* certainly suggest that this non-core or arguably certainly non-core matter is not necessarily and not necessarily appropriate for arbitration and it can and under certain circumstances does deserve judicial determination.

Oral Ruling Regarding the Defendant Global Client Solutions, LLC's Motion to Compel Arbitration Under the Federal Arbitration Act and Alternative Motion to Dismiss the Adversary Complaint Filed November 13, 2014 (Docket #7 and #8) and Plaintiff's Response filed December 5, 2014 (Docket 313) at 4-8, *Larson v. Swift Rock Financial, Inc., d/b/a World Law Group, d/b/a World Law Debt; Orion Processing, LLC, d/b/a World Law Processing; and Global Client Solutions, LLC* (*In re Craig*), Adv. Pro. No. 14-1507-SBB (Bankr. D. Colo. March 19, 2015) DE 43.

Trustee's first claim is under Section 548 of the Code, a core proceeding over which this Court has jurisdiction and under the State Act, although it may not be core, this Court nevertheless can exercise jurisdiction to hear the claim. The

---

[11] Judge Brooks' oral ruling was being transcribed, and the transcriptionist did not understand that "Sterm" meant *Stern v. Marshall*, 564 U.S. 462, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011).

> claim is closely related and intertwined with the Section 548 claim and I would add, it's all part of the if you will, basic framework. It is a claim that basically and primarily is part of the Trustee's task and presentment of an issue to define and collect estate assets for administration in the estate and the Court if need be can make findings, proposed findings of fact and conclusions for further determination if there are Stern [sic] considerations.

*Id*. at 9.

44.     On appeal the district court noted that it could find no factual findings of the bankruptcy court to be clearly erroneous and after a *de novo* review, Judge Blackburn concurred with Judge Brooks' legal conclusions.  "The factual findings and legal conclusions of the bankruptcy court are amply supported in the record." *Craig*, 545 B.R. at 54.  The court continued,

> In the context of this case, enforcing arbitration would substantially undermine the orderly, efficient, and effective administration of the bankruptcy estate. In addition, requiring arbitration likely would deprive the estate, and thus its creditors, of the possibility of any recovery of assets for the estate. This conflict is stark. In the circumstances of this case, the fundamental purposes of the Bankruptcy Code are paramount to the requirements of the arbitration clause and the FAA.

*Id.*

### CONCLUSION

45.     To send both the core and non-core claims or even just to send the non-core UDTP Claim to arbitration would have a significant adverse effect upon the adjudication of these claims and upon the fundamental purposes of the Bankruptcy Code and would risk compromising the Debtor's rights under North Carolina law.  Denying the arbitration and retaining the matters in the bankruptcy court will provide for the orderly, efficient and effective administration of the bankruptcy estate; now therefore;

It is ORDERED, ADJUDGED and DECREED as follows:

1.     The Motion to Compel Arbitration and Dismniss [sic] or Stay Proceedings filed by ClearOne and the Motion to Compel Arbitration filed by GCS are denied; and

2.      ClearOne and GCS are directed to file responsive pleadings to the Amended

Complaint within twenty days of this Memorandum Opinion and Order.


END OF DOCUMENT